OPINION OF THE COURT
Alice Schlesinger, J.
Jimmie Hendrix was born 48 years ago to Annette Baxter in Dublin, Georgia. He never knew his natural father. By the time he reached his early twenties, he had developed serious, chronic health problems, specifically epilepsy and asthma. In 1961 Jimmie moved to New York to be closer to his mother who was working and living as a domestic in Long Island. A friend of his mother’s introduced him to Henry Pittman who agreed to rent him a room in apartment No. 25 at 2-4 St. *899 Nicholas Avenue in Manhattan. This began a relationship between Jimmie, Ms. Baxter, and Mr. Pittman that lasted over 25 years. The relationship developed into one of devoted concern, sharing, trust, loyalty, and love. In short, in the early manhood of Jimmie’s life and the middle to late years of Annette Baxter’s and Henry Pittman’s they became a family to each other. Jimmie found the father he had never had.
The above description may appear to smack of melodrama. Yet through several days of testimony from neighbors, friends, church people, and respondent Hendrix himself, it was shown conclusively that the circumstances of their lives did result in the strongest of family bonds.
Henry Pittman was still working when Jimmie moved in with him. Originally the arrangement was that Jimmie would pay $60 per month for a room in the apartment. He would buy his own food and supplies, and do his own cooking and cleaning. On weekends, his mother would spend her days off staying with him at the apartment. In those days there was also another male roomer.
The familial feelings began to develop in the mid-1960’s though there was no specific discussion about the change. In approximately 1970 Pittman said that henceforth they would start living as one family. The other roomer had left. From then until Pittman’s death in 1986 at the age of 93, they did precisely that. Their finances were merged. Pittman retired in the late 1960’s and lived on a pension and Social Security. Hendrix was first collecting Public Assistance but then began receiving SSI based on his physical disabilities. All expenses were shared and items such as food would be shopped for and bought as a unit to be cooked and eaten together.
Except for arthritis, up until 1973-1974, Henry Pittman enjoyed good health. However, at this time he began to fail and his physical health deteriorated mainly from diabetes. This led to the amputation of both legs, the first in 1978 and the second the following year. Because of this loss, Mr. Pittman became confined to a wheelchair and in the later and final years of his life confined to a bed at his home or in a hospital. He needed constant attention and care which was provided by Jimmie. During the last 7 to 8 years of Pittman’s life, Jimmie was constantly tending to him and in Jimmie’s words, "with pleasure”. This care included bathing, him, turning him in bed, and changing his diapers as many as 3 and 4 times a day after he became incontinent.
*900 During Mr. Pittman’s many hospital stays, Jimmie and Ms. Baxter would visit everyday and Jimmie would remain with him the entire day. He testified credibly that some days he would be put out for remaining so late and that the doctors would give him a special pass so that he could come and go at will.
It is important to note here that through these long years of life, poor health, and eventual death, Henry Pittman did not become senile or out of touch with reality. It is important because, as the testimony clearly shows, reality for him was actively participating in his church affairs, enjoying holidays and birthdays, at which friends would be invited and gifts exchanged. Daily, he interacted with Jimmie as a confidant and father. In the earlier years he would make sure Jimmie would take care of his own health needs and get him to a doctor when needed. Mr. Pittman’s own natural son and wife had died years before and he took to introducing Jimmie and referring to him as his "boy” or his "son”. Jimmie treasured Mr. Pittman in return and confided in him. Mr. Pittman would listen to Jimmie’s problems and counsel him.
Toward the end of his life Mr. Pittman executed a power of attorney in favor of Jimmie. This was done so his government checks could be cashed and his financial problems dealt with. After his death Pittman left whatever possessions he had to Jimmie and his mother. The latter two, along with Mr. Pittman’s brother from Florida, made all the funeral arrangements.
The above is merely a summary of the believable testimony given by Jimmie but importantly corroborated by eight witnesses called by respondents.
Mary Scantleberry, age 67, who has lived at this building for 40 years and regularly visited apartment 25 said, "They would communicate like a family. They were so close and that Mr. Pittman would say about Jimmie, " 'He’s my son now.’ ”
Helen Ruffin, age 82 and living at the building 45 years, spoke of how lovable Mr. Pittman was. She talked of how she would visit him in the hospital and would always find Jimmie and Annette Baxter there. Mr. Pittman would call Jimmie "my son” and she saw Jimmie care for him day and night. They were a "nice family and I liked them.”
Barbara Ann Green, a younger person, worked as a cashier at a local supermarket and testified that she first became acquainted with Jimmie but would then regularly go "to see *901 the family.” She would often, during a period of 10 years, spend Thanksgiving, Christmas and share birthdays with them. In her words: "They were a loving family” where Mr. Pittman treated Jimmie "like a son.”
Sylvester Doyle, a former porter at the building, would also regularly drop in to see them and found them to be "always jolly”. When asked on cross-examination whether he knew if they were actually related to each other, he stated, "I don’t know if they were family but they acted like one”.
Finally, George Davis gave eloquent testimony as to his knowledge of these people. He is Pastor of St. Paul’s Community Church at West 145 Street. He talked of how active Henry Pittman was at the church and for 16 years was chief steward there. Reverend Davis would often visit the apartment and eat with the family. Not only did he believe that Jimmie acted like a son but offered that he behaved admirably in this capacity. For example, when Mr. Pittman was having trouble hearing, Jimmie would be there to communicate. About a month before his death, Mr. Pittman was advised that he needed further surgery. He didn’t want it. Reverend Davis talked to Pittman, Jimmie and Ms. Baxter together to aid them in coming to a decision. It was Jimmie who related this decision to the hospital. During that last illness, Jimmie never left Mr. Pittman’s side.
I have taken the time to highlight some of this corroborative testimony but in doing so I have not done it justice. The presence of these good people from the building and community to give testimony on what they felt in their hearts and knew in their minds about this family, was both a moving and significant part of the hearing.
As the final courtroom witness, respondent called Dr. Peter Stein. He is a sociologist and teacher at William Patterson College in Wayne, New Jersey. He has published 5 books and 20 articles in the area of his expertise, the family in America.
Dr. Stein was an impressive addition to respondent’s case. In preparation for his testimony, he had interviewed Jimmie Hendrix for about two hours, listened to his testimony in court, was told about other witnesses’ accounts and had viewed photographs of Henry Pittman at home with Jimmie and Ms. Baxter.
Dr. Stein’s opinion was that these three people constituted a family unit. He explained that in recent years there has been much research and writing in the area of nontraditional *902 family units, i.e., ones not based on legal or biological factors. He described various criteria used by himself and other experts in this area in determining whether a true family unit exists, as opposed, for example, to a close friendship. These criteria were (1) longevity of relationships; (2) the level of commitment and support among its members. This support includes both material and emotional support; (3) the sense in which the individuals define themselves as a family unit, using terms such as "son” and "father” for example, and also the way that neighbors and other institutions define them as a family unit; (4) the way in which members of the unit come to rely on each other to provide daily family services; (5) the shared history of the group as evidenced for example in the taking, displaying and preserving of "family” photos; and (6) the high degree of religious and moral commitment.
Applying all of these criteria, Dr. Stein found not only the existence of a family unit here but one he would applaud. He stressed the importance of the quality of the relationship. Here, he found tremendous evidence of dedication, caring and self-sacrifice.
Finally, he discussed sociological works specializing in the American black family. He described how such nonlegal and biological families have been prevalent through the years. They have developed and survived due in part to the migration of southern blacks to urban areas in the north. Deprived economic conditions have also contributed to the formation of these nontraditional family units.
Petitioner introduced no evidence to contradict respondents on the existence of these family ties. It is hard to conceive that such evidence existed such was the power of respondent’s case.
Respondents have moved to dismiss this holdover petition. The proceeding is based on allegations by the landlord that Jimmie Hendrix and Annette Baxter are mere licensees and thus upon the death of the rent-controlled tenant, Henry Pittman, their license has expired.
I had directed a hearing on the issues of whether respondents were entitled to a dismissal based on their claims that they were entitled to remain in the premises as members of the family unit of the tenant who were living with him at the time of his death. (See, New York City Rent and Eviction Regulations § 56 [d] [renum 9 NYCRR 2204.6 (d)].) Respondents alleged as well waiver and estoppel. This issue was also dealt with at the hearing and in the concluding memoranda.
*903 Both sides have cited and discussed the recent case of Athineos v Thayer (NYLJ, Mar. 25, 1987, at 14, col 4 [Civ Ct, Kings County, Greenstein, J.]). The facts there involved an orphan who had been taken into the tenant’s family in 1943 when she was 14 years old. Despite being treated exactly like the family’s other children, she was never formally adopted. However, the court, citing the recently expanded interpretation of family for section 56 (d) purposes, as well as the broad definition of a "tenant” found in the rent control laws (New York City Rent and Eviction Regulations §2 [o] [renum 9 NYCRR 2200.2 (o)]) declared that Ms. Thayer was in fact a cotenant entitled to continued possession and additionally qualified to remain in possession under section 56 (d) as a member of the deceased statutory tenant’s family unit.
Petitioner seeks to distinguish that case and adopts an apparent argument of the landlord there. He contends that Jimmie Hendrix is only a boarder as he clearly began his occupancy in that fashion and continued it based on his monetary contributions to the household.
However, I do not accept this designation. It is obvious to me that Mr. Hendrix’s relationship changed radically in the 25 years he lived in apartment 25. Therefore, though the parties started out as strangers with Jimmie paying Mr. Pittman for his room, as discussed above, for the last 15 or more years that status changed forever to become a close family unit. After all, virtually all marriages begin in much the same way. Strangers meet and like each other, sometimes begin to live with each other and sometimes decide to spend a lifetime together.
As was pointed out by Judge Greenstein, recent cases have included in section 56 (d) coverage members of the family beyond the immediate family: nieces and nephews, in-laws, adopted children, people of the opposite and the same sex who have lived together as "man and wife” but have not formalized their relationships.
It should be noted here that this apartment was one regulated by rent control and not rent stabilization. The distinction is important.
The Rent Stabilization Code, as recently amended, limits continued possession to immediate family members who had been living with the tenant and then proceeds to define those individuals. (9 NYCRR 2520.6 [n].) Under rent control however, a broader description is given, "some other member of *904 the deceased tenant’s family who has been living with the tenant” (New York City Rent and Eviction Regulations [9 NYCRR] § 2204.6 [d]). This broader language has been read to refer to those outside the tenant’s immediate family, to members of a "family unit” or "household”. (See, e.g. Bistany v Williams, 83 Misc 2d 228 [1975]; Matter of Waitzman v McGoldrick, 20 Misc 2d 1085 [1953].) This larger protected family group has also been recognized by the Court of Appeals in Sullivan v Brevard Assocs. (66 NY2d 489 [1985]).
Petitioner also concedes this point when in his posttrial memorandum of law he states, "On the other hand, if a blood relationship does not exist between the deceased and the surviving occupant then the latter has the burden of proving that he or she is an integral part of the family unit (marriage, stepchildren, adoption, etc.).”
Additionally there is another line of cases which have expanded the definition of family in the area of zoning. Three major cases, all decided by the Court of Appeals, offer relevant direction.
In City of White Plains v Ferraioli (34 NY2d 300 [1974]) the city argued that a group home consisting of a married couple living with 2 of their own children and with 10 additional foster children could not continue to exist as such in an "R-2” or single-family zone. However, Chief Judge Breitel speaking for a unanimous court concluded otherwise. The children were placed in the home because they had been neglected or abandoned. As much as possible it was hoped by the agency placing them in this home, as well as the City of New York which funded the arrangement, that the children would benefit and grow from living in a home environment.
The court found that "[t]he children, natural and foster, live together as if they were brothers and sisters and the Seards were their common parents. The household is maintained as a family would be in a single housekeeping unit with kitchen facilities” (supra, at 304) and further "It is significant that the group home is structured as a single housekeeping unit and is, to all outward appearances, a relatively normal, stable, and permanent family unit”. (Supra, at 304.)
In Group House v Board of Zoning & Appeals (45 NY2d 266 [1978]), the Town of North Hempstead attempted to exclude a group home for foster care children from existing in a house in Port Washington. The zoning ordinance relied upon by the town allowed only one-family residences to exist in the section *905 of the city where the house was located. The ordinance defined a family as " '[o]ne (1) or more persons related by blood, marriage or legal adoption residing or cooking or warming food as a single housekeeping unit; with whom there may not be more than two (2) boarders, roomers or lodgers who must live together in a common household’ ”. (Supra, at 270.) The court, in finding in favor of the petitioner, decided the case on the ground "that the 'group home’ as described by petitioner before the commissioner and the board cannot be distinguished from a 'natural’ family.” (Supra, at 271.)
The decision is a significant one and broadens the holding of City of White Plains v Ferraioli (supra). First, it involved surrogate parents, not necessarily related to each other. It was also an environment where the children would not necessarily be expected to remain for long periods of time. For this reason Chief Judge Breitel dissented in the holding. Secondly, the court makes it clear that its decision is limited to homes "which serve as the functional equivalent of a family * * * Whether a particular 'group home’ comes within this description is essentially a factual question.” (Supra, at 274.)
Finally, in McMinn v Town of Oyster Bay (66 NY2d 544 [1985]) the court, without dissent, struck down a zoning ordinance restricting occupancy in single-family houses to persons related by blood, marriage or adoption (unless over 62) as infringing upon the due process protections of the New York State Constitution. The factual situation here involved a home owned by the plaintiffs and rented out to four, young, unrelated men. A criminal prosecution was commenced against the McMinns who then brought this action.
The holding of the court striking down the ordinances referred to the two previously discussed cases (City of White Plains v Ferraioli, supra, and Group House v Board of Zoning & Appeals, supra) for the standard that "if a household is 'the functional and factual equivalent of a natural family’ * * * the ordinance may not exclude it from a single-family neighborhood and still serve a valid purpose” (supra, 66 NY2d, at 550). The court went on to say "paragraph (a) of the provision * * * [of the zoning ordinance involved here] which defines family as '[a]ny number of persons, related by blood, marriage, or legal adoption’, is not per se unconstitutional provided the ordinance contains an alternative definition of family as any number of unrelated persons living together who meet the indicia we set forth for the functional equivalent of a traditional family in Group House v Board of Zoning & Appeals *906 * * * and City of White Plains v Ferraioli”. (Supra, 66 NY2d, at 550-551.)
While it is true that these cases are limited to the legality of zoning ordinances, the court’s ultimate holding as to the claimant’s due process rights has significance tc this case.
Section 56 (d) of the New York City Rent and Eviction Regulations gives certain rights to family members as regards their continued occupancy of apartments that they had been living in with the statutory tenant. Under the reasoning of McMinn v Town of Oyster Bay (supra), for that regulation to be constitutional and not infringe on due process protections, it would have to apply to alternative definitions of family as long as they meet the indicia set forth by the court for the functional equivalent of a traditional family. (See, Group House v Board of Zoning & Appeals, supra; City of White Plains v Ferraioli, supra.)
The reasoning of McMinn v Town of Oyster Bay (supra) and the other cases discussed are equally applicable to housing cases under rent control regulations because in the first instance State action is involved in each. Secondly, the kind of State action involved, i.e., the police powers of the State, is founded on similar municipal concerns. For example, the United States Supreme Court in Village of Belle Terre v Baraas (416 US 1) ruled that a community may appropriately limit the use of certain neighborhoods. "The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.” (Supra, at 9.)
In section 26-401 ("Declaration and findings”) of the Administrative Code of the City of New York there is the following language: "[TJhat unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare”.
Similarly, the legislative intent behind the Zoning Resolution of the City of New York is "to promote and protect public health, safety, and general welfare.” (NY City Zoning Resolution, Preamble, at 1.)
The zoning ordinances and rent control regulations both concern the quality of the community or neighborhood, a legitimately recognized concern of local government.
Further, in McMinn v Town of Oyster Bay (supra) the court *907 discusses the two-prong test used to measure whether the ordinance is a valid exercise of police power. The first is that it is in furtherance of a legitimate governmental purpose. The second is that there must be "a 'reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end’ ” (supra, 66 NY2d, at 549). The ordinance in McMinn v Town of Oyster Bay failed to meet the second prong.
In applying the same criteria to section 56 (d) of the New York City Rent and Eviction Regulations, it is clear that this provision which allows family members to remain in rent-controlled apartments has a legitimate governmental purpose. That is, to further and encourage the preservation of family units with the myriad benefits this bestows upon each of its members. This includes the mutual care of family members for each other.
Obviously it is also a recognition by the State and city of the value of the enduring family.
The issue then is whether the regulation can survive the test of a reasonable relation between the end sought and the means used to achieve it by restricting its protection to family members related solely by blood or marriage.
Under the circumstances here which include my finding that Mr. Hendrix, Ms. Baxter and Mr. Pittman lived together as a family, and specifically that Jimmie was the equivalent of Henry Pittman’s son, albeit never formally adopted, it would be irrational and violative of the respondent’s due process rights for the regulations to be read in such a restrictive manner. It would be irrational particularly where it is clear that Jimmie for so many years served Henry Pittman as a devoted son. This relationship is precisely what the State and city in enacting these regulations meant to define, value, and encourage.
Respondents raise two other points in their motion to dismiss. They argue that they are entitled to remain in the premises under the broad definition of tenant found in the rent control regulations since they lived openly with Mr. Pittman for more than 20 years.
In furtherance of this argument they cite Athineos v Thayer (supra), Matter of Veltri v Joy (55 AD2d 529), other cases and several administrative rulings by the Division of Housing and Community Renewal.
The rationale for the finding of tenancy in Athineos v *908 Thayer (supra) is unclear to this court and therefore I decline to apply it here. Similarly, the administrative decisions cited by respondent are vague and, like Veltri v Joy (supra), appear to be limited to decontrol proceedings. Therefore, they are not dispositive here.
Finally the respondents argue that based on the actions of the landlord’s predecessors, which are binding on petitioner, there has been a waiver of objections to their continued possession. Alternatively, but relying on similar facts, they urge me to adopt the doctrine of equitable estoppel and find that by respondents’ detrimental reliance on the words and actions of petitioner’s predecessors through the years they are entitled to remain in the subject premises. (Doubledown Realty Corp. v Gibbs, 122 Misc 2d 32.) Regarding this point, Jimmie Hendrix gave testimony as well as Henrietta Williams, the former superintendent of the building, the latter by way of sworn deposition. In partial rebuttal, Jerome Wassenberg, former agent and owner of the premises, and Maurice Mann, current landlord, testified.
Since I am deciding in respondents’ favor based on my finding of the existence of a family relationship, it is unnecessary to resolve these competing claims of waiver and estoppel.
Therefore, based on the overwhelming, convincing and uncontested evidence of the existence of a family unit, I find that the respondents are entitled to the protections of the New York City Rent and Eviction Regulations and dismiss the petition.